# H. H. THOMAS v. CHICAGO GREAT WESTERN RAILROAD COMPANY.[1]

November 11, 1910.

Nos. 16,860—(93).

**Guarding dangerous machinery — charge — damages.**

Action to recover damages for the death of the plaintiff's intestate, an employee of the defendant, by reason of its alleged negligence. The evidence tended to show that the deceased was sent by the defendant to repair an engine and make a pump work in its detached pumphouse; that he was killed while so engaged by his clothing being caught in an unguarded shaft and a protruding key thereon, which it was practicable to have guarded. The jury were instructed that the pumphouse was in the same class as a factory, mill, or workshop, and, if the shaft with the key was so situated as to be dangerous to workmen, it would be within the provisions of the statute requiring it to be guarded. *Held*, that the instruction was correct; that whether the defendant was negligent, or the deceased was guilty of contributory negligence, or assumed the risks, were made by the evidence questions of fact; that no reversible errors were made by the trial court in its rulings as to the admission of evidence, or in its instructions to the jury; and that the damages, as reduced by the trial court from $5,000 to $3,250, are not excessive.

Action in the district court for Hennepin county by the administrator of the estate of Howard C. Powers, deceased, against Horace G. Burt and Charles H. F. Smith, as receivers of the Chicago Great Western Railway Company, and the Chicago Great Western Railroad Company, to recover $10,000 for the death of his intestate on March 4, 1909. Prior to the commencement of the action the railroad had been sold to the Chicago Great Western Railroad Company, which assumed all the obligations of the receivers. At the trial the court ordered that the action proceed as against the railroad company. The facts are stated in the opinion.

[1]Reported in 128 N. W. 297.

The complaint alleged the pumphouse in question was small and poorly lighted, so that it was difficult to discover the working of the machinery; that a spool was negligently fastened to the shaft by means of a steel key, in such manner that it protruded from the spool about three inches, and when the shaft was put in motion it revolved so rapidly that the key could not be discerned, and the machinery was operated without a guard; that the receivers negligently failed to provide proper light so that the shaft, spool and key could be seen when the machinery was not in motion, and to provide the deceased with a safe place in which to work, and that deceased had no knowledge of any source of danger in working in proximity to the shaft. The answer denied the allegation that the building was poorly lighted, or that it was difficult to discern the machinery; denied any negligence in the construction of the key holding the spool; admitted the key could not be seen in motion, but denied that there was any difficulty in discerning the position of the key, shaft, or spool when not in motion, and denied in the exercise of ordinary care any covering of the machinery was required; and alleged that the deceased assumed the risks of the work. The reply was a general denial.

The case was tried before Simpson, J., who, at the close of the evidence, denied the motion of defendant for a directed verdict. The jury returned a verdict in favor of plaintiff for $5,000. The court denied defendant's motion for judgment notwithstanding the verdict, and denied its motion for a new trial, if plaintiff would accept a reduction of the verdict to $3,250. From this order, defendant appealed. Affirmed.

*Briggs, Thygeson, Loomis & Everall,* for appellant.

*James A. Peterson* and *Grotophorst, Evans & Thomas,* for respondent.

START, C. J.

The plaintiff's intestate, Howard C. Powers, was killed while in the employ of the defendant railroad company. This action was brought in the district court of the county of Hennepin to recover the damages sustained, by his next of kin, by his death due to the

alleged negligence of the defendant. The trial resulted in a verdict for the plaintiff in the sum of $5,000. The defendant made a motion for judgment in its favor notwithstanding the verdict, or for a new trial. The trial court made its order denying the motion for judgment and granting the motion for a new trial, unless the plaintiff consent to a reduction of the damages awarded to the sum of $3,250. The defendant appealed from the order, and here assigns nineteen alleged errors, which raise the questions whether the trial court erred in denying the defendant's motion for a directed verdict, or in its rulings on the admission of evidence, or in its instructions to the jury, or in refusing to grant a new trial on account of excessive damages.

We have examined the record with reference to these several questions, and find that the first is the only one meriting serious consideration.

The defendant's first contention is that there was no evidence justifying a finding that the death of the deceased was caused by any negligence on its part. The specific negligence charged in the complaint is that the defendant failed to exercise due care in furnishing the deceased a safe place in which to work, in that it left an unguarded shaft and protruding key therein so located that the deceased, while working in the line of his duty, was caught in the shaft and killed. The evidence was sufficient to sustain a finding of the facts following:

The deceased was an unmarried man, twenty-four years of age, of good habits and industrious. He left him surviving a father and mother, who were in a measure dependent upon him for their support, to which he contributed before and after he was twenty-one years old. He was employed about a month before his death by the defendant as a repairman, with the promise of the position of gas engine repairman when he had learned the business. On March 4, 1909, he was sent to Coates, Minnesota, to repair a gasolene engine and to make a pump work, which were in the defendant's pumphouse, a detached building fifteen and one-half by fifteen and one-half feet.

The pumping machinery consisted of an upright gasolene engine

geared to connect with a pump, and set upon a block of iron about eighteen inches in height. Upon upright extensions of the iron base were placed the journals and shaft, which were about three feet above the floor. Just within the journal on the north side there was a spool one foot in length, and one foot in diameter at each end. This spool was keyed to the shaft by a key with the head protruding at the southerly end, a total length of three inches. For a distance of one and one-fourth inches from the face of the spool, this key protruded five-eighths of an inch beyond the circumference of the shaft. Beyond that was a "head" protruding one and five-eighths inches outside the circumference of the shaft. The key, when the gasolene engine was at rest, was always in a position slightly under the shaft and between the shaft and the gasolene engine. It could not be seen when the shaft was in motion. It was practicable to guard this shaft and key. There was an oil cup so located that by standing upon the base upon which the shaft rested the operator could reach over and pour oil into the cup, with nothing to interfere except the protruding key. This was a proper manner to put oil in the cup.

The deceased at five o'clock p. m. had so far completed his work that he dismissed his assistant, the station agent; but he remained to complete the work. A short time afterwards the agent happened to pass the pumphouse, looked in, and discovered the engine in motion and the deceased's body wound around the shaft. He was dead.

The coroner came, and in his testimony described the situation as follows: "We entered the pumphouse; * * * walked around where the body was, which was lying over the shaft, naked. I examined it, and, of course, the first impression was to look around and see what I thought was the cause of death. One arm was pulled out here; a limb broken; clothing was all torn off; the body was all grease. * * * I picked up his watch, and borrowed a knife from somebody, and commenced to cut the clothing off that was wrapped around the shaft, and we cut until we got to the end where it was attached to the key—the clothing, overalls, where it was attached to the key." The oil can was "lying on the floor, tipped

down on that side." The oil can was lying down. I could not remember whether the oil was running out of it.

There was conflict in the evidence as to some of the facts we have stated; but the evidence most favorable to the plaintiff must be accepted as correct.

The defendant contends that there was no evidence that the unguarded key caused the death of the deceased, and that the evidence leaves the question as to how he was first caught a mere matter of conjecture. It is true there is no direct evidence on the question, for he was alone when he was hurled to his death. The circumstantial evidence, however, not only affords a reasonable basis for inferring the cause of his death, but unerringly points to such cause; for it was at the unguarded key where his clothing first commenced to wind around the shaft. The evidence was amply sufficient to justify the jury in finding that the deceased, having finished repairing the engine, started it, to test it, to see if it would properly operate the pump; that it was necessary to put oil in the cup, and he stepped upon the base, and reached over the shaft, and was in the act of oiling, when the key, which was then revolving and could not be seen, caught his clothing.

It is further urged that, if the deceased was caught by the key, the defendant is not liable, because he was injured by the thing he was sent to repair. There is no basis in the evidence for this claim. He was sent to repair the engine and make the pump work; nor is there any suggestion that the shaft and key were repaired, or needed to be repaired. The fact that they were unguarded caused the injury, and not any lack of repair.

Again, it is urged that no duty rested upon the defendant to guard the shaft and key, although it was admittedly practicable to do so, because the engine and pumphouse is not within the factory statute. R. L. 1905, § 1813. The trial court instructed the jury that the building in question was in the same class as a factory, mill, or a workshop, and submitted to them the question whether the shaft with the protruding key was in the pumphouse, so located as to be dangerous to workmen, and therefore within the provision of the statute that it should be guarded. The instruction was correct, and

upon the evidence the jury were justified in finding that the defendant was negligent. Rase v. Minneapolis, St. P. & S. S. M. Ry. Co., 107 Minn. 261, 120 N. W. 360, 21 L.R.A. (N.S.) 138; Snyder v. Waldorf Box Board Co, 110 Minn. 40, 124 N. W. 450.

It is also contended that it conclusively appears from the evidence that the deceased assumed the risk of working about the unguarded shaft and key, and was guilty of negligence as a matter of law. It is quite apparent, from a consideration of the evidence, which tends to support the facts we have stated, that each of these questions was one of fact, and was properly submitted to the jury.

It follows that the defendant was not entitled to an instructed verdict in its favor. Nor was it entitled to an absolute order granting it a new trial, for we find no reversible error in the rulings of the trial judge, in his rulings on the admission of evidence or on the defendant's requested instructions. We are of the opinion that the damages, as reduced, are not excessive.

Order affirmed.